COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



| | § | No. 08-21-00058-CV |
|---|---|---|
| IN THE INTEREST OF: | § | Appeal from the |
| D.A.A.-B., | § | 388th District Court |
| A CHILD. | § | of El Paso County, Texas |
| | § | (TC# 2016DCM0868 ) |

## O P I N I O N

The parties here were in a legally recognized same-sex marriage during which one of the spouses conceived and bore a child through artificial insemination. This appeal asks us to determine whether, following divorce, the non-biological former spouse has standing to bring a Suit Affecting the Parent-Child Relationship (SAPCR) to determine her rights to possession of the child, as well as child support issues. The trial court ruled that the non-biological spouse lacked standing to bring the suit, in part, because the court believed she did not meet the definition of a "parent" under the gender-specific definitions set forth in the Texas Family Code. Interpreting the Family Code in a gender-neutral fashion, as we are constitutionally required to do, we conclude that the non-biological spouse has standing to file a SAPCR petition based on her allegation that she is the child's mother. Although we do not reach the merits of her allegation, we simply hold that she is entitled to her day in court. We therefore reverse the order of dismissal of the SAPCR,

and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Parties' Marriage and Divorce

The two former spouses, Cristina and Andrea,[1] were legally married in New Mexico in 2013.[2]  During the marriage, they agreed that Andrea would become pregnant through artificial insemination, using sperm donated by a male friend, who we refer to as "Luis."  The parties did not utilize a doctor or other medical professional to accomplish the insemination, but did so at home using an insemination kit that Cristina and Andrea had bought for this purpose.  Cristina participated in the insemination procedure, with the understanding that she and Andrea would both be considered the child's parents.  The insemination succeeded, and Cristina attended all of Andrea's OB-GYN appointments, and the two attended multiple baby showers before the child's birth.

Andrea gave birth to the child in an El Paso hospital on August 27, 2014, with Cristina present.  Andrea informed the hospital's registrar that she and Cristina were both the child's parents, but since same-sex marriages were not yet legal in Texas, they could not list Cristina as the other parent on the birth certificate; only Andrea's name appears on it.   However, at Andrea's request, the child's surname, as it appears on the birth certificate, is a combination of the two spouse's last names.

Over the next two years, Andrea and Cristina raised the child together in the same home,

---

[1] To protect the identity of the child, we refer to the parties solely by their first names.

[2] In the proceedings below, Cristina presented uncontested testimony and evidence about the circumstances of the parties' marriage and divorce, the events occurring both before and after the birth of the child, and the oral agreements that the parties had over the child and her parentage.  We take our recitation of the facts from that testimony.

shared parenting duties, represented to others that the child belonged to both of them, and encouraged the creation of a bond between the child and their extended families. However, the spouses separated in November 2015, with Cristina remaining in the family home, while Andrea first moved out with a family member. Shortly before the separation, Cristina began suffering from depression, and began counseling. And during this same time, Cristina was diagnosed with cancer that required her to undergo chemotherapy treatments.

Despite knowing of Cristina's medical and mental health issues, Andrea—who appeared to have taken primary custody of the child—gave Cristina assurances, as reflected in a series of text messages between the two, that Cristina would always be the child's mother and would have the right to spend time with her. The two entered into an informal oral agreement resembling a standard possession schedule in which Cristina had possession of the child every other weekend, as well as every Wednesday starting at 4:00 pm until Thursday at 7:00 pm.[3] In addition, (1) Cristina routinely picked up the child Sunday night on Andrea's weekends keeping her until Monday morning, (2) the two split holidays and school vacation days by agreement, and (3) Cristina took possession of the child at other times when Andrea's work schedule required her to travel. During the child's overnight visits, Cristina would perform typical parenting duties, including bathing the child, dressing her, and brushing her teeth. Cristina also began paying Andrea a minimum of $100 in child support each month, representing her half of the child's daycare expenses, and further kept the child on her health insurance through her employment.

In April 2016, Andrea filed a divorce petition in an El Paso district court, and the two,

---

[3] A standard possession schedule provides that "the possessory conservator shall have the right to possession of the child as follows: (1) on weekends throughout the year beginning at 6 p.m. on the first, third, and fifth Friday of each month and ending at 6 p.m. on the following Sunday; and (2) on Thursdays of each week during the regular school term beginning at 6 p.m. and ending at 8 p.m., unless the court finds that visitation under this subdivision is not in the best interest of the child." TEX.FAM.CODE ANN. § 153.312.

3

proceeding without counsel, obtained an agreed-upon divorce decree. In the petition, however, due to what Cristina described as "confusion," Andrea stated that there were no children of the marriage, and the decree contained that statement as well, and the decree thus did not address custody, visitation, or support issues for the child.[4] Despite the decree's failure to address custody or support issues, the spouses orally agreed that they would maintain the same possession schedule they had been following since their separation, and Cristina continued to make support payments to Andrea and kept the child on her insurance. According to Cristina, there were periods when she had possession of the child for more than 50% of the time after the divorce. Cristina, however, admitted that she never adopted the child or sought any court decree determining her rights until she filed the SAPCR petition, explaining that she did not believe it was necessary to do so given the assurances Andrea had given her that she would not deny Cristina her rights as a parent.

According to Cristina, their informal arrangement continued without incident until September 2017 when the two began to have "arguments." Cristina testified that Andrea thereafter unilaterally decided to stop allowing Cristina to have overnight visitation with the child, claiming that she was concerned about Cristina's mental and physical health, and that she believed Cristina's "judgment was off." Cristina recalled that her last overnight visit with the child was on or about September 30, 2017. Despite being denied visitation, Cristina continued to send Andrea support payments and kept the child on her insurance policy.

## B. Cristina Files Her Original SAPCR Petition

In November 2017, Cristina filed her original SAPCR petition, seeking the entry of a conservatorship order to determine custody and support issues, alleging that she had standing to

---

[4.] The record indicates that Cristina filed a bill of review to clarify the divorce decree, which the trial court ruled on at some point during the pendency of the SAPCR proceedings. However, the record before us does not contain any information regarding that ruling.

4

bring the suit as "the mother of the child." In her petition, Cristina sought temporary orders appointing her and Andrea as joint managing conservators, and giving Cristina the exclusive right to designate the child's primary residence. She also sought an order requiring Andrea to pay child support. In response, Andrea filed a general denial of Cristina's allegations, and expressly denied that Cristina was the child's mother.

At the first hearing on Cristina's request for temporary orders, the trial court refused to rule on the request until Luis, the sperm donor, could be served, so that the court could determine his rights to the child, if any. Cristina then filed an amended SAPCR petition, which she served on Luis, again alleging that she had standing as the mother of the child. Luis filed a general denial, but did not expressly deny Cristina's status as the mother of the child, and did not seek to have his rights adjudicated over the child.

## C. The Trial Court Denies Cristina's Request for Temporary Orders

In September 2018, the trial court held a second hearing on Cristina's request for temporary orders, at which all parties were represented by counsel. Cristina was the only witness at the hearing. She testified to the facts set forth above about the parties' marriage, the oral agreements she had with Andrea on the child's parentage, and Cristina's right to possession of the child. In addition, Cristina testified that Luis never provided any financial assistance for the child's support—nor had she and Andrea expected him to do so. Neither Andrea nor Luis contradicted Cristina's testimony, and Luis never asserted that he was claiming any rights to the child.

At the close of the hearing, Andrea made an oral motion for a directed verdict, arguing that Cristina lacked standing under the Texas Family Code to bring her SAPCR petition because she did "not meet the definition of mother" as set forth in the Code. Andrea emphasized that Cristina was admittedly not the child's biological mother and never adopted the child. As explained

5

below, Cristina responded that she had standing under recent decisions from the United States Supreme Court recognizing the constitutional right of a spouse in a same-sex marriage to be treated just as a spouse in an opposite-sex marriage when determining parentage issues of a child born during the marriage. At the close of the hearing, the trial court stated that it was granting Andrea's motion for a directed verdict. In particular, the court expressed its opinion that Cristina could not be considered the child's parent, as she was admittedly not the child's biological mother, and that there was "not a presumption of paternity anymore, because [Cristina] identified [Luis as] the father."

Following the hearing, the trial court denied Cristina's request for temporary orders. In its order, the court expressly found that Cristina "lacked standing to maintain a Suit Affecting the Parent Child Relationship under Texas Family Code § 102.003(1) as she does not meet the Texas Family Code definition of parent as set forth in § 101.024, nor has the mother-child relationship been established under § 160.201 of the Texas Family Code." The trial court, however, did not enter a final order denying Cristina's SAPCR petition at that time.

### D. Cristina Files Her Second Amended SAPCR Petition

Soon after, Cristina filed her second amended SAPCR petition, again seeking a conservatorship order, but this time alleging that she had standing to sue as "she is a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition pursuant to Texas Family Code section 102.003(a)(9)."[5] And she once again sought temporary orders

---

[5] Section 102.003(a)(9) provides that "An original suit may be filed at any time by . . . a person, other than a foster parent, who has had actual care, control, and possession of the child for at least six months ending not more than 90 days preceding the date of the filing of the petition." TEX.FAM.CODE ANN. § 102.003(a)(9).

appointing the parties as temporary joint conservators. However, she did not renew her allegation that she was the child's "parent" in her amended petition.

### E. The Trial Court Grants Andrea's Motion to Dismiss Cristina's Petition

Andrea thereafter moved to dismiss Cristina's second amended petition, arguing that Cristina lacked standing to bring her petition, as she did not have actual care, control, or possession of the child for the required 90 days before filing her amended petition. In particular, she pointed out that Cristina admitted that she did not have possession of the child after September 30, 2017, and she argued that Cristina had only 90 days thereafter in which to file a petition asserting standing on that basis. And she also argued that, although Cristina filed her original petition within that 90-day period, she failed to allege in her original petition that she had standing on that basis, and it was too late to allege standing on that basis over a year later in her amended petition. In response, Cristina argued that her amended petition should relate back to the date she filed her original petition, which she contended should be considered the operative date for determining whether she had standing under this Code provision.[6]

The trial court heard Andrea's motion in October 2019, and at the end of the hearing, stated that it would take the matter under submission pending its review of the parties' post-trial briefs. The court advised the parties, however, that she would not rule on Cristina's renewed motion for temporary orders, believing that it would not be in the child's best interest to "rekindle" her relationship with Cristina, as the relationship might not be permanent. Over a year later, on December 30, 2020, on the trial court judge's last day in office, she signed an order granting Andrea's motion to dismiss Cristina's SAPCR petition, without providing any findings of fact or

---

[6] At the hearing on Andrea's motion to dismiss, as well as in post-hearing briefs, the parties also argued over whether Cristina had established that she had actual care, control, and possession of the child during the six months preceding the filing of her original petition as required by the Family Code.

7

conclusions of law. Cristina thereafter filed a request with the newly elected trial court judge seeking such findings under Rule 296 of the Texas Rules of Civil Procedure, and further filed a motion for new trial. Ultimately, however, the newly elected judge declined to enter any findings of fact or conclusions of law and denied Cristina's motion for new trial.[7] This appeal followed.

## II. ISSUES ON APPEAL

In her first issue, Cristina contends that the trial court erred in finding that she lacked standing to bring her original SAPCR petition as the child's parent under section 102.003(a)(1) of the Texas Family Code. The crux of the argument is that the trial court failed to construe the Code in a constitutionally-sound "gender-neutral" manner that affords spouses in same-sex marriages the same rights that spouses in opposite-sex marriages have in determining parentage. Andrea counters that Cristina cannot be considered the child's "mother" under the gender-specific provisions set forth in the Family Code defining that term, and that in any event, Cristina waived her right to claim standing as a "parent" on appeal because: (1) Cristina only pled that she was the child's "mother," rather than her "parent," in her original and first amended petitions; (2) Cristina eliminated her claim that she was the child's mother as the basis for standing in her second amended petition, which is her "live pleading"; and (3) Cristina did not raise her constitutional challenges over her right to assert standing as a parent in a written pleading. Although we typically address waiver or preservation issues first, we find it appropriate here to first discuss the merits of Cristina's and to address the waiver issues in the context of that discussion.

In her second issue, Cristina contends that she has standing under section 102.003(a)(9) of the Code—as alleged in her second amended petition—arguing that she had possession of the child

---

[7] Initially, the newly elected trial court judge issued an order granting in part Cristina's motion for new trial, but later vacated that order and reinstated the original order dismissing Cristina's petition.

8

for over six months, ending within 90 days of the date she filed her original petition, and that this allegation should relate back to date on which she filed her second amended petition, making it timely filed  We need not address this issue, however, as we resolve Cristina's first issue in her favor, finding that she has standing as the child's parent under section 102.003(a)(1) of the Code.

## III.  STANDARD OF REVIEW

In general, standing involves a threshold determination of whether a plaintiff has a sufficient "justiciable interest" in the suit's outcome to be entitled to a judicial determination.  *In Interest of H.S.*, 550 S.W.3d 151, 155 (Tex. 2018).  "Without standing, a court lacks subject matter jurisdiction" over the case, and the merits of the plaintiff's claims thus cannot be litigated or decided.  *Id.*, *quoting Austin Nursing Ctr. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005); *see also In re T.M.P.*, 417 S.W.3d 557, 566 (Tex.App.--El Paso 2013, no pet.) (recognizing that standing is a threshold issue in a case involving child custody and visitation issues, and is a component of subject matter jurisdiction); *In re H.R.L.*, 458 S.W.3d 23, 29 (Tex.App.--El Paso 2014, no pet.) (recognizing that a party's lack of standing in a child custody case deprives the trial court of subject matter jurisdiction).  The question of whether an individual has standing must be determined before a court may reach the merits of the individual's claims.  *In Interest of H.S.*, 550 S.W.3d at 155 (recognizing that a standing issue is not about whether an individual will prevail in their suit, but about whether they may sue in the first place).

Whether a party has standing, like other issues implicating a court's subject matter jurisdiction, is a question of law that an appellate court reviews de novo.  *Id.*; *see also In re J.M.G.*, 553 S.W.3d 137, 141 (Tex.App.--El Paso 2018, no pet.).  In evaluating standing, we construe the pleadings in the plaintiff's favor, but we also consider relevant evidence offered by the parties.  *In Interest of H.S.*, 550 S.W.3d at 155*, citing Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555

9

(Tex. 2000). And when, as here, the trial court has entered no findings of fact or conclusions of law, we will imply that the trial court made all findings necessary to support its judgment, provided that: (1) the necessary findings are raised by the pleadings and supported by the evidence; and (2) the decision can be sustained by any reasonable theory consistent with the evidence and applicable law. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (per curiam,); *see also Viera v. Viera*, 331 S.W.3d 195, 204 (Tex.App.--El Paso 2011, no pet.) (applying rule in reviewing a trial court's judgment in a child custody case).

## IV. CRISTINA'S STANDING AS A PARENT

Title 5 of the Texas Family Code, entitled "The Parent-Child Relationship and the Suit Affecting the Parent-Child Relationship," governs standing questions in all SAPCR proceedings. *See In Interest of H.S.*, 550 S.W.3d at 155 (recognizing that standing to bring a SAPCR petition is governed by section 102.003 of the Family Code). Section 102.003 of the Code, found in Subtitle A, provides that an original SAPCR proceeding "may be filed at any time by . . . a parent of the child." TEX.FAM.CODE ANN. § 102.003(a)(1). And in turn, section 101.024 of the Code, also found in Subtitle A, provides that a "parent" means "the mother, a man presumed to be the father, a man legally determined to be the father, a man who has been adjudicated to be the father by a court of competent jurisdiction, a man who has acknowledged his paternity under applicable law, or an adoptive mother or father." *Id*. §101.024. However, Subtitle A does not provide any definitions for determining who may be considered either a "mother" or a "presumed father" for purposes of bringing a SAPCR proceeding. Instead, Subtitle A directs our attention to Subtitle B of the Code, and more particularly to Chapter 160, known as the Uniform Parentage Act (UPA), which the Texas Legislature adopted in 2001, for guidance in determining who fits within these definitions. *See* TEX.FAM.CODE ANN. § 101.025 (the "[p]arent-child relationship" means the

10

legal relationship between a child and the child's parents as provided by Chapter 160 [and] includes the mother and child relationship and the father and child relationship").[8]

In turn, section 160.204(a)(1) of the UPA provides that a "man is presumed to be the father of the child if he is married to the mother of the child and the child is born during the marriage." TEX.FAM.CODE ANN. § 160.204 (a)(1). In addition, the Act provides that a "father-child" relationship between a "man and a child," may be established by, among other things, (1) an "unrebutted presumption" that the man is the father of a child born during the marriage in accordance with section 160.204 of the Family Code, or (2) that he consented to "assisted reproduction" by his wife under Subchapter H of the Code, which resulted in the birth of the child. *Id.* § 160.201(b)(1)(5). But section 160.201 provides a very different method of establishing the "mother-child relationship, providing that the relationship is established between a "woman and a child" by: "(1) the woman giving birth to the child; (2) an adjudication of the woman's maternity; or (3) the adoption of the child by the woman." *Id*. § 160.201(a)(1)-(3).

Given the gender-specific terminology of these provisions, if viewed in isolation, one might conclude that section 160.201 only applies to establishing a man's paternity for a child born during an opposite-sex marriage, and does not apply to establish the maternity of a female spouse in a same-sex marriage under these same circumstances. However, because we cannot view these provisions in isolation, we find that this apparent interpretation by the trial court was in error.

---

[8] To the extent that the concurring opinion believes that the definitions set forth in the UPA are not applicable to SAPCR proceedings, we disagree. As set forth above, the Code expressly provides that the definitions set forth in the UPA are to be applied to original SAPCR proceedings. Section 106.103(a) provides that the UPA governs every determination of parentage in this state. TEX.FAM.CODE ANN. § 160.103(a). Accordingly, in determining whether Cristina has standing to bring an original SAPCR petition in her status as a parent under section 102.003(1), we must necessarily look to the provisions of the UPA in making that determination.

**A. Viewing the Texas Family Code Through the Lens of *Obergefell* and *Pavan***

Our interpretation of the Code is necessarily guided by the United States Supreme Court's rulings in *Obergefell* and its progeny, addressing the rights of spouses in same-sex marriages. In 2015, the Court in *Obergefell* held that "the right to marry is a fundamental right inherent in the liberty of the person, and [that] under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty." *Obergefell v. Hodges*, 576 U.S. 644, 675 (2015). Thus, the Court held that state laws must treat same-sex couples in a civil marriage "on the same terms and conditions as opposite-sex couples." *Id.* at 675-76 (holding that Michigan state laws were invalid when they excluded same-sex couples from civil marriage). As well, the Court in *Obergefell* further held that there was "no lawful basis for a State to refuse to recognize a lawful same-sex marriage performed in another State on the ground of its same-sex character." *Id.* at 681.

Soon after, the Court, relying on its ruling in *Obergefell*, further recognized that spouses in same-sex marriages are also entitled to equal rights when it comes to children born of the marriage. *Pavan v. Smith*, 137 S. Ct. 2075, 2078–79 (2017) (per curiam). In that case, a same-sex couple was denied the right to have both of their names placed on the birth certificate of a child they had conceived through artificial insemination, based on an Arkansas statute that provided for the inclusion of the birth mother's name on the birth certificate, and if married, the name of her "husband." *Id.* at 2077. The Arkansas Supreme Court held that the statute did not sidestep *Obergefell*, reasoning that the "statute centers on the relationship of the biological mother and the biological father to the child, not on the marital relationship of husband and wife." *Id.* at 2077. The United States Supreme Court disagreed, however, finding that the decision "denied married same-sex couples access to the "constellation of benefits that the Stat[e] ha[s] linked to marriage."

12

*Id.* at 2078, *citing Obergefell,* 576 U.S. at 646-47. The Court reasoned that because the State gave a married woman in Arkansas who conceives a child by means of artificial insemination, the right, if not the duty, to put her male spouse's name on the child's birth certificate, it could not deny the same right of a married woman in a same-sex marriage to put her female spouse's name on the certificate. *Id.* The Court further noted that being recognized as the parent of the child on a birth certificate gives a parent "important" rights, such as making medical decisions for the child or enrolling the child in school. *Id.* And in turn, the Court held that the Arkansas statute, as interpreted by the Arkansas Supreme Court, denied "same-sex parents" the benefits that the state accorded to parents in an opposite-sex marriage, resulting in the same type of "disparate treatment" that *Obergefell* proscribes. *Id.*

We must therefore interpret the standing provisions in the Texas Family Code in accordance with the constitutional requirements of *Obergefell* and *Pavan.* *See Treto v. Treto*, 622 S.W.3d 397, 401–02 (Tex.App.--Corpus Christi–Edinburg 2020, no pet.) (recognizing the need to construe statutes, including the Texas Family Code, in a manner that is consist with the Texas and federal constitutions); *see also City of Pasadena v. Smith*, 292 S.W.3d 14, 19 (Tex. 2009), *quoting City of Houston v. Clark*, 197 S.W.3d 314, 324 (Tex. 2006) (recognizing that "[w]hen faced with multiple constructions of a statute, we must interpret the statutory language in a manner that renders it constitutional if it is possible to do so."); *see also* TEX. GOV'T CODE ANN. § 311.021(1) ("[i]n enacting a statute, it is presumed that . . . compliance with the constitutions of this state and the United States is intended"). In other words, if possible, we must construe these provisions in a manner that affords spouses in a same-sex marriage the same benefits granted to spouses in an opposite-sex marriage—which includes treating them equally when determining whether a spouse (or former spouse) in a same-sex marriage has standing to bring a SAPCR petition to assert her

13

rights to a child born during the marriage. *See Treto*, 622 S.W.3d at 401–02 (recognizing that under *Pavan*, we are to give effect to the ancillary benefits of a same–sex marriage, including the determination of maternity for the non–gestational spouse of a child born to the marriage).

And we can do so here based on the provisions of the Code itself. The UPA includes a section stating that the "provisions of this chapter relating to the determination of paternity apply to a determination of maternity." TEX.FAM.CODE ANN. § 160.106. The unambiguous and plain language of this statute make it clear that the legislature intended to allow female spouses to establish their parentage just as male spouses are allowed to do. *See Treto*, 622 S.W.3d at 401–02 (concluding that section 160.106 of the Code must be read together with other provisions in the Family Code to give spouses in same-sex marriages the right to establish their parentage just like spouses in opposite-sex marriages have); *see also Maxim Crane Works, L.P. v. Zurich Am. Ins. Co.*, 642 S.W.3d 551, 557 (Tex. 2022) (recognizing that in interpreting statutes, a court looks to the "plain meaning of the words chosen" by the legislature, and if the "statute is clear and unambiguous," a court must apply its words according to their common meaning). When read alongside the U.S. Supreme Court's holding that states must extend equal benefits to spouses in same-sex marriages, we reach the inexorable conclusion that the Family Code gives spouses in same-sex marriages the same opportunity to assert their parentage to a child born during the marriage, as it gives to spouses in opposite-sex marriages. This interpretation not only gives effect to all relevant portions of the Code, as written by the legislature, but also avoids an interpretation of the Code that would render it unconstitutional under the U.S. Supreme Court's holdings. *Treto*, 622 S.W.3d at 402.

## B. The Code's Presumed Parentage Provisions

In the only Texas case that we have found applying the holding in *Pavan* in determining

14

the parental rights of spouses in same-sex marriages, our sister court in *Treto* used a similar analysis, and concluded that a female spouse in a same-sex marriage was the "presumed" parent of a child born during that marriage under a constitutionally-sound interpretation of the Code.[9] *Id*. at 402-403. As here, the two female spouses in *Treto* agreed that one of them (the gestational spouse) would become pregnant through means of artificial insemination conducted in a non-medical setting, and she successfully gave birth to a child during their marriage. *Id*. at 398. Unlike the current case, however, when the two spouses divorced, the non-gestational spouse sought to avoid a judgment declaring her the child's parent and ordering her to pay child support. *Id.* at 399. In particular, she argued that she did not meet the definition of a parent under the Family Code, as she was not the child's biological mother. *Id.* Our sister court disagreed, noting that under the Family Code, if "gender was not an issue," the non-gestational spouse would be treated as the presumed "father" because she was married to the gestational spouse then she became pregnant and the child was born of the marriage. *Id.* at 400, *citing* TEX.FAM.CODE ANN. § 160.204(a)(1) ("A man is presumed to be the father of a child if . . . he is married to the mother of the child and the child is born during the marriage."). And in turn, the court held that under the Supreme Court's ruling in *Pavan*, it was necessary to interpret this statute to apply equally to

---

[9] Andrea relies on the Beaumont court's holding in *In re A.E.*, No. 09-16-00019-CV, 2017 WL 1535101, at *8 (Tex.App.--Beaumont Apr. 27, 2017, pet. denied) (mem. op.), in which it held that a female spouse in a same-sex marriage lacked standing to bring a SAPCR petition to determine her rights to a child born during the marriage by means of artificial insemination, as she was not the child's biological mother, and did not otherwise have any right to claim that she was a parent under the Family Code. In that case, the Beaumont court rejected the non-gestational spouse's argument that the Family Code provisions should be interpreted in a gender-neutral manner under the Supreme Court's holding in *Obergefell*. *Id.* at *3. The Beaumont court expressed its view that *Obergefell* was limited to prohibiting "the State from enforcing laws prohibiting same-sex couples from marrying or prohibiting the recognition of marriages between same-sex couples lawfully solemnized elsewhere." *Id.*, citing *Obergefell*, 135 S. Ct. at 2605. And it concluded that *Obergefell* did not hold that every state law related to the marital relationship or the parent-child relationship must be "gender neutral." *Id.* As the court in *Treto* observed, however, the Beaumont court's opinion in *In re A.E.*, which was decided in April of 2017, predated the Supreme Court's holding in *Pavan*, which reached an opposite conclusion. *Treto v. Treto*, 622 S.W.3d 397, 401 n.2 (Tex.App.--Corpus Christi–Edinburg 2020, no pet.). We therefore conclude that *Pavan* impliedly disavowed this ruling.

spouses in same-sex marriages in establishing their maternity for children born during the marriage, as it does to male spouses in opposite-sex marriages in establishing their paternity. *Id.* at 402-03, *citing Pavan*, 137 S.Ct. at 2078 ("under *Pavan*, we are to give effect to the ancillary benefits of a same–sex marriage, including the determination of maternity for the non–gestational spouse of a child born to the marriage").

The court therefore held that the non-gestational female spouse was the "presumed" parent of the child born during her same-sex marriage, and she could therefore not simply "walk away" from her responsibilities to the child simply because she was not its biological mother. *Id.* at 402-03. In reaching this determination, the court observed that applying this presumption of parentage to spouses in same-sex marriages not only satisfies *Pavan's* requirement of placing such spouses on equal footing with spouses in opposite-sex marriages, but also satisfies the policies of this state in promoting family stability and in protecting the interests of children through the enforcement of child support obligations.[10] *Id.* at 401, *citing In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1994) (discussing history of marital presumption); *Williams v. Patton*, 821 S.W.2d 141, 145 (Tex. 1991) (recognizing that it is the "strong, long-standing policy of this state to protect the interests of its children," which includes the policy of enforcing child support obligations).

We agree with the court's analysis in *Treto* in applying the presumption of parentage to same-sex spouses, and add the observation that applying the presumption promotes the long-standing principle that the "best interest of the child is always the primary consideration of the court in determining issues of conservatorship and possession of or access to a child." *See Doncer v. Dickerson*, 81 S.W.3d 349, 353 (Tex.App.--El Paso 2002, no pet.), *citing*

---

[10] The court in *Treto* also noted that other state courts that have adopted the Uniform Parentage Act have concluded that the marital presumption applies to non-gestational mothers in same-sex marriages. *See Treto*, 622 S.W.3d at 401 (collecting cases).

16

TEX.FAM.CODE ANN. § 153.002.  And in turn, it is presumed to be in a child's best interest for parents to be appointed joint managing conservators, and to allow a child to have "frequent and continuing contact with parents who have shown the ability to act in the best interest of the child, and to encourage parents to share in the rights and duties of raising their children after the parents have separated or dissolved their marriage."  *Id.*, *citing* TEX.FAM.CODE ANN. §§153.131(b); 153.001; *see also In re Mata*, 212 S.W.3d 597, 604–05 (Tex.App.--Austin 2006, orig. proceeding), *quoting Troxel v. Granville*, 530 U.S. 57, 65 (2000) ("T]he interest of parents in the care, custody, and control of their children [ ] is perhaps the oldest of the fundamental liberty interests recognized by' the courts.").

Unlike *Treto*, here we have a mother who has offered some testimony that she has already taken on the rights and responsibilities of raising and supporting a child born during her marriage, but has been denied the right to seek a conservatorship order from the court because she did not meet the gender-specific definitions of a "parent" as set forth in the Family Code.  But just as the court in *Treto* would not allow the Code's gender-specific definitions of a parent to be used as a shield to protect a female spouse in a same-sex marriage from the obligations owed to a child born of that marriage, so too, we will not allow those definitions to be used as a sword to prevent a spouse from asserting her rights as a parent.  Accordingly, we conclude that Cristina can be considered the presumed parent of the child under section 160.201 of the Code, given her unrebutted testimony establishing that the child was born during her lawful marriage to Andrea. *See* TEX.FAM.CODE ANN. § 160.201(b)(1).

### C.  The Code's Assisted Reproduction Provisions

Andrea, however, argues that even if we determine that Cristina can be considered the child's presumed parent, the presumption was rebutted by Cristina's own pleadings and testimony

17

in which she expressly acknowledged that she was not the child's biological mother and was not genetically related to the child. Andrea points out that the Code provides that the presumption may be rebutted upon a determination that the presumed father is not genetically related to the child. *See id.* § 160.204(b)(1).[11] And Andrea asserts that just as the presumption of paternity may be rebutted by establishing that a male spouse in an opposite-sex marriage is not genetically related to a child of his marriage, so too, any presumption of maternity should be rebutted by establishing that a female spouse in a same-sex marriage is not genetically related to a child of her marriage. She therefore argues that this refutes any claim that Cristina has to assert standing as a parent. We disagree.

Andrea's argument ignores section 160.703 of the Family Code, which expressly provides for times when spouses have agreed to conceive a child through means of "assisted reproduction." Section 160.703—which like other sections in the Family Code—is gender specific, provides that when a "husband . . . consents to assisted reproduction by his wife as provided by Section 160.704, he is the father of a resulting child." *Id*. § 160.703(a). Section 160.704 further provides that the husband's consent may be reflected in a document signed by both the husband and wife and kept by a licensed physician, but that a husband's failure to sign such a consent either "before or after the birth of the child does not preclude a finding that the husband is the father of a child born to his wife if the wife and husband openly treated the child as their own." *Id*. § 160.704(a), (b). Although the language used in this provision seemingly only relates to situations involving

---

[11] Section 160.204(b) provides that "A presumption of paternity established under this section may be rebutted only by: (1) an adjudication under Subchapter G; or (2) the filing of a valid denial of paternity by a presumed father in conjunction with the filing by another person of a valid acknowledgment of paternity as provided by Section 160.305. TEX.FAM.CODE ANN. § 160.204(b)(1)(2). Subchapter G provides that a "civil proceeding may be maintained to adjudicate the parentage of a child," which includes genetic testing to determine a child's paternity. TEX.FAM.CODE ANN. § 160.601 et seq.

18

opposite-sex spouses, for the same reasons that we construed the parental presumption provisions in a gender-neutral manner, so too we must interpret this provision in a gender-neutral manner in accordance with the holding in *Pavan*. Constitutionally, it must apply equally in determining parentage of a child born to a same-sex couple through assisted reproduction.

Andrea, though, asserts that this Code provision—whether construed in a gender-neutral manner or not—is inapplicable to their situation because she was not artificially inseminated with help from a licensed physician, and was instead inseminated in a non-medical setting. In this regard, Andrea points out that the Family Code defines a "donor" as "an individual who provides eggs or sperm to a licensed physician to be used for assisted reproduction" and expressly provides that a "donor is not a parent of a child conceived by means of assisted reproduction." *Id*. § 160.702. In turn, Andrea correctly argues that Luis cannot be considered a "donor" under the Code, given the non-medical setting in which the insemination took place, and that Luis was therefore "not excluded from the definition of parent under the Family Code." In light of this provision, Luis could bring his own claim of paternity given his genetic relationship to the child. *See In Interest of P.S.*, 505 S.W.3d 106, 110 (Tex.App.--Fort Worth 2016, no pet.) (individual who provided sperm to a "friend" for purposes of artificial insemination without the use of a licensed physician could not be considered a "donor" under the Family Code, and was therefore not prohibited from asserting his rights as the father).[12]

But Luis's right to claim paternity under these circumstances does not deprive Cristina of standing to bring a SAPCR petition, even though the insemination occurred in a non-medical

---

[12] As discussed above, the unrebutted evidence presented at the temporary orders hearing demonstrated that the parties did not intend for Luis to have any parental rights, and he has not yet asserted any such rights, nor has he taken on any parental obligations to the child. However, if on remand he attempts to do so, we are confident the trial court will be able to resolve any such factual dispute regarding who the parties intended would be the child's parents.

19

setting. Simply stated, the Code does not make this a requirement for determining a spouse's parentage of a child born through such a procedure. As set forth above, the Code provides that a husband who has consented to "assisted reproduction" by his wife—either formally or informally—is considered the father of the "resulting child." *Id.* § 160.703. And, in turn, the Code defines "assisted reproduction" to mean "a method of causing pregnancy other than sexual intercourse," to include, among other things, "intrauterine insemination." *Id.* § 160.102(2)(A). The Code does not provide that the intrauterine insemination must be accomplished in a medical setting before a non-gestational spouse may assert his or her parental rights to a child born by such means during a marriage. In other words, the Code only addresses a *donor's* right to bring a claim of paternity when the insemination occurs in a non-medical setting, and does not address the rights of the non-gestational spouse in this situation. *See Treto*, 622 S.W.3d at 400 (recognizing that the question of whether a donor can claim that he is a child's parent is distinct from the question of whether a spouse has standing to assert her rights as a parent to a child conceived by artificial insemination in a same-sex marriage).

We see no rational basis for concluding that a non-gestational spouse who consents to have her spouse artificially inseminated outside of a medical setting should be denied standing to bring a SAPCR petition seeking conservatorship over the child. To the contrary, under the plain language of the statute, if both spouses have signed a written consent document agreeing to the insemination, or if they have openly treated a child born through that method as their own after its birth, the trial court may still find that the non-gestational spouse is the parent of the child born in this way. *Id.* § 160.704(a), (b). We therefore conclude that the fact that Andrea was artificially inseminated in a non-medical setting does not alter Cristina's standing to claim her status as a parent under the Code.

**D. Cristina Did Not Waive Her Right to Claim That She Has Standing as a Parent**

We next turn to Andrea's various arguments that Cristina waived her right to assert her standing as a parent under the Family Code, either due to pleading deficiencies, or her failure to preserve her "constitutional claims" for appellate review. And as well, we address the concurring opinion's related concerns regarding the sufficiency of Cristina's pleadings, together with the issue of whether Cristina should be estopped from asserting that she is the child's mother in light of the agreed divorce decree's statement that no children were born during the marriage.

*1. Cristina sufficiently alleged that she was a "parent" in her original pleadings*

Andrea argues that no matter how we interpret the Family Code, we should not consider Cristina's argument that she has standing as the child's "parent" for two procedural reasons. First, she contends that Cristina waived her to right to assert standing as the child's parent, as she failed to allege that she was the child's "parent" in any of her pleadings, or more particularly, the child's "presumed parent," and instead only alleged in her original and first amended petitions that she was the child's "mother." Second, she contends that Cristina dropped the allegation that she had standing as a parent in the second amended petition, and instead only alleged that she had standing as a person who previously had "care, control, and possession of the child" within the requisite time frames under the Code.

The question of whether Cristina's pleadings sufficiently alleged standing is a question of law that we review de novo. *See Ryder Integrated Logistics, Inc. v. Fayette Cnty.*, 453 S.W.3d 922, 927 (Tex. 2015) (per curiam) (recognizing that appellate courts review jurisdiction and pleading sufficiency de novo). In answering that question, we keep in mind that technical pleading rules do not carry the same weight in family law cases as they would in a typical civil case—family law cases are distinct because the "best interest" of the child is of paramount concern

21

in cases involving child custody and support issues. *See Interest of S.G.*, No. 08-19-00008-CV, 2020 WL 103971, at \*5 (Tex.App.--El Paso Jan. 9, 2020, no pet.) (mem. op.), *citing In re L.D.F.*, 445 S.W.3d 823, 832 (Tex.App--El Paso 2014, no pet.) ("In child custody cases, where the best interests of the child are the paramount concern, technical pleading rules are of reduced significance."); *Leithold v. Plass*, 413 S.W.2d 698, 701 (Tex. 1967) (recognizing that technical rules of practice and pleadings are of little importance in determining issues on the custody of children).

Under this relaxed standard, Cristina's pleadings are not insufficient simply because she did not label herself as the child's "parent" or "presumed parent," or otherwise identify the Family Code provisions on which she asserted standing. To the contrary, by alleging that she was the child's "mother" she sufficiently conveyed standing as the child's "parent" under the Family Code. The Code expressly provides that a "mother" is included in the definition of a "parent." TEX.FAM.CODE ANN. § 101.024(a). As well, standard dictionary definitions mirror this Code provision, defining a "mother" as a "female parent" of a child. *See Mother*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/mother (last visited August 18, 2022).

We also reject the suggestion that a child may only have one mother, and that Cristina as the non-gestational spouse may not use that term in her pleadings, based *Pavan*'s recognition that non-gestational spouses have a constitutional right to be recognized as the parents of a child born during a marriage. *Pavan*, 137 S. Ct. at 2078–79. And to state the obvious, a child born into a same-sex marriage between two female spouses will necessarily have two "mothers" serving as parents. We therefore conclude that Cristina's allegation that she has standing as the child's "mother" was sufficient to allege standing under a gender-neutral and constitutionally mandated interpretation of the Family Code.

22

We also reject Andrea's argument that Cristina cannot rely on the allegation that she has standing as a parent because she failed to include this allegation in her second amended petition. In support of her argument, Andrea relies on Rule 65 of the Texas Rules of Civil Procedure, for the proposition that Cristina's second amended petition superseded earlier petitions, and that we may therefore only consider the allegations asserted there. However, we do not construe Rule 65 so narrowly. Rule 65 provides that:

> Unless the substituted instrument shall be set aside on exceptions, the instrument for which it is substituted shall no longer be regarded as a part of the pleading in the record of the cause, unless some error of the court in deciding upon the necessity of the amendment, or otherwise in superseding it, be complained of, and exception be taken to the action of the court . . . .

TEX. R. CIV. P. 65. Accordingly, under Rule 65, an amended petition typically supersedes the allegations made in the plaintiff's original petition. *See FKM P'ship, Ltd. v. Bd. of Regents of Univ. of Hous. Sys.*, 255 S.W.3d 619, 633 (Tex. 2008) (recognizing that causes of action not in an amended pleading are usually effectively dismissed when the amended pleading is filed); *Mekeel v. U.S. Bank Nat. Ass'n*, 355 S.W.3d 349, 354–55 (Tex.App.--El Paso 2011, pet. dism'd) (recognizing that the purpose of filing an amended petition is to add something to, or withdraw something from, what has been previously pleaded, and when an amended pleading is filed, it supplants all former pleadings). However, Rule 65 itself provides an exception when a party is complaining of "some error of the court in deciding upon the necessity of the amendment." TEX. R. CIV. P. 65; *see also Wells Fargo, N.A. v. Clower*, No. 02-20-00058-CV, 2021 WL 4205056, at *6 n.12 (Tex.App.--Fort Worth Sept. 16, 2021, no pet.) (mem. op.) (recognizing that a "superseded pleading can still be regarded as part of the case if someone has complained about 'some error of the court in deciding upon the necessity of the amendment'"); *Kinney v. Palmer*, No. 04-07-00091-CV, 2008 WL 2515696, at *2 (Tex.App.--San Antonio June 25, 2008, no pet.) (mem. op.), *citing*

23

TEX. R. CIV. P. 65 (recognizing exception).

Cristina alleged in her original and first amended petitions that she had standing to bring a SAPCR petition as the child's "mother." However, in its order denying Cristina's request for temporary orders, the trial court expressly ruled that Cristina did not have standing as a parent under the Family Code to bring her SAPCR petition.[13] And in response to that ruling, Cristina requested permission to file an amended petition setting forth an alternative basis for standing—a request in effect caused by the trial court's erroneous ruling that she lacked standing as a parent. And on appeal, Cristina is complaining of the trial court's error in making that earlier ruling. We therefore conclude that the exception set forth in Rule 65 applies to allow Cristina to bring her challenge to the trial court's ruling that she lacked standing as the child's parent to bring a SAPCR as alleged in her earlier petitions.

### 2. *Cristina adequately raised her constitutional claims in the trial court*

Andrea contends that Cristina waived her right to bring her "constitutional challenge" to the gender-neutral provisions in the Family Code, because Cristina only raised her constitutional arguments orally during the temporary orders hearing and failed to raise them in a *written* pleading. In support of her waiver argument, Andrea relies on *In re M.M.M.*, 428 S.W.3d 389, 397 (Tex.App.--Houston [14th Dist.] 2014, pet. denied), in which our sister court held that a party could not raise a constitutional challenge to the validity of a statute on appeal because he failed to

---

[13] The trial court's order finding that Cristina lacked standing was made in denying Cristina's request for temporary orders and was therefore not a final appealable judgment. *See In re K.N.K.*, No. 05-10-01053-CV, 2011 WL 489932, at *1 (Tex.App.--Dallas Feb. 14, 2011, no pet.); *see also* TEX.FAM.CODE ANN. § 105.001(e) ("Temporary orders rendered under this section are not subject to interlocutory appeal."). Cristina might have challenged this ruling by a petition for writ of mandamus, but she could also challenge the ruling once the trial court entered a final judgment. *See* TEX.FAM.CODE ANN. § 109.001(b-5) ("A party may seek review of the trial court's temporary order under this section by: (1) petition for writ of mandamus; or (2) proper assignment in the party's brief."); *see also In re Moore*, 511 S.W.3d 278, 286 (Tex.App.--Dallas 2016, no pet.) (recognizing that a party may review a finding in a temporary order as part of a "pending appeal from the final judgment").

raise the issue in written pleadings in the trial court, and that raising the issue orally at a hearing could not preserve the challenge. In that case, however, the party was appealing from an order granting summary judgment, and Rule 166a(c) of the Texas Rules of Civil Procedure specifically provides that in summary judgment proceedings, "Issues not expressly presented to the trial court by *written* motion, answer or other response shall not be considered on appeal as grounds for reversal (emphasis added)." TEX.R.CIV.P. 166a(c); *In re M.M.M.*, 428 S.W.3d at 397 (recognizing that even constitutional challenges not expressly presented to the trial court by written motion, answer, or other response in a summary judgment proceeding will not be considered on appeal as grounds for reversal). Here, the trial court's ruling was not made in the context of a summary judgment proceeding. Instead, as set forth above, the trial court entered its ruling finding that Cristina lacked standing in response to an oral motion for directed verdict that Andrea made during the midst of the temporary orders hearing. Accordingly, Rule 166a's strict requirement that all issues must be presented in writing in the trial court is inapplicable.

Instead, we apply the general preservation rule set forth in Rule 33.1(a) of the Texas Rules of Appellate Procedure, which provides that a party may preserve an issue for appellate review by presenting it to the trial court in a "timely request, motion, or objection," and by obtaining either an express or implied ruling on the issue. TEX.R.APP.P. 33.1(a)(1)(A),(2)(A). And Rule 33.1 has no requirement that a party must raise an issue in writing to preserve it for appellate review; courts have held that a party may preserve error under this rule by raising an issue through oral objection. *See Wright v. State Farm Lloyds*, No. 03-20-00384-CV, 2022 WL 567860, at *2 (Tex.App.--Austin Feb. 25, 2022, no pet.) (mem. op.) (party preserved error where counsel verbally argued issue during a hearing in response to opposing party's motion for sanctions, finding that counsel's argument constituted a sufficient "complaint," "request," or "objection" to

25

satisfy the requirements of Rule 33.1), *citing Van Es v. Frazier*, 230 S.W.3d 770, 775–76 (Tex.App.--Waco 2007, pet. denied) (party preserved error for appellate review where he presented his grounds in opposition to a request for sanctions "in written responses and/or in arguments presented in the hearings"); *see also Tex. Dep't of Protective & Regul. Servs. v. Sherry*, 46 S.W.3d 857, 861 (Tex. 2001) (holding that purported father did not preserve his constitutional claim to standing in paternity case when he neither asserted his constitutional claims in his trial court pleadings or at the trial court hearing on standing). We thus conclude that Cristina sufficiently preserved her constitutional issues by arguing these issues at the temporary orders hearings. In fact, it was Andrea who first raised the issue at the hearing by making her oral motion for directed verdict claiming that Cristina did not meet the definition of a parent under the Family Code. And Cristina responded in kind by arguing—just as she does on appeal—that the Family Code must be interpreted in a constitutionally-sound and gender-neutral manner under the Supreme Court's holdings in *Obergefell* and its progeny to permit same-sex spouses in to assert their rights as parents just as opposite-sex spouses have a right to do under the Code. And in turn, the trial court impliedly rejected this argument when it concluded that Cristina lacked standing as a "parent" under the Code.

Accordingly, for the reasons set forth above, we conclude that Cristina did not waive her right to challenge the trial court's ruling that she lacked standing as a parent under the Family Code to bring her SAPCR petition. And because we conclude that Cristina did in fact have standing under the Code to bring her SAPCR petition, we conclude that the trial court erred in dismissing her petition.

### 3. Cristina was not required to bring an independent suit to adjudicate her parentage

Although not raised by Andrea, the concurring opinion faults Cristina for not expressly requesting an "adjudication" of her parentage under the UPA in her SAPCR petition, and for instead only requesting a conservatorship and support order. As the argument goes, this failure means that Cristina lacks standing to bring her SAPCR petition on that basis alone.

But we disagree that Cristina was required to expressly seek an "adjudication" of her parentage under the UPA as a prerequisite for asserting standing as a parent in her SAPCR petition. The UPA provides that a party *may* bring an independent civil suit seeking the adjudication of his or her parentage of a child. *See* TEX.FAM.CODE ANN. § 160.601(a) (providing that "civil proceeding may be maintained to adjudicate the parentage of a child"). However, the Code provides that a party may also bring an original SAPCR seeking conservatorship and support of a child and allows for at least two situations in which a *man* may bring such a petition before having his parentage established. First, a "presumed father" may bring a SAPCR seeking a conservatorship order regarding a child born during a marriage, and is entitled to have his rights determined in that proceeding without the need to file an independent adjudication proceeding under the UPA. *See Ortiz v. Hernandez*, No. 14-11-01031-CV, 2012 WL 5988847, at *1-2 (Tex.App.--Houston [14th Dist.] Nov. 29, 2012, no pet.) (mem. op.) (holding that a presumed father had standing under section 102.003 of the Code to pursue a SAPCR seeking custody of child born during his marriage to mother, even though he was time-barred from seeking to adjudicate his parentage under the UPA). Similarly, section 102.003(8) gives standing to a "man alleging himself to be the father of a child." TEX.FAM.CODE ANN. § 102.003(8). In that event, a trial court has the authority to determine the man's status as a father, without the need to file an independent

27

UPA adjudication proceeding. *See In re K.I.A.*, 205 S.W.3d 14, 15-16 (Tex.App.--Eastland 2006, no pet.) (finding that a man who alleged that he was a child's biological father had standing under section 102.003(a)(8) to bring a SAPCR petition seeking a conservatorship order, and trial court had the authority to adjudicate his rights in that proceeding); *In re J.H.*, No. 02-20-00366-CV, 2021 WL 733083, at *2 (Tex.App.--Fort Worth Feb. 25, 2021, no pet.) (mem. op.) (man alleging himself to be father of child had standing to bring a SAPCR petition under section 102.003(a)(8) seeking conservatorship of child, as well as an independent adjudication proceeding under the UPA). Applying a gender-neutral interpretation of these provisions, it follows that if a man contending that he is a child's father has the opportunity to have his rights determined in an original SAPCR proceeding, so too should a woman be afforded that same opportunity.

Our sister court's holding in *Interest of N.M.B.*, No. 04-18-00111-CV, 2018 WL 6516120, at *2 (Tex.App.--San Antonio Dec. 12, 2018, pet. denied) (mem. op.) does no violence to this conclusion. In *N.M.B.*, the appellant, who had been in a same-sex (unmarried) relationship with the appellee, brought an original SAPCR proceeding seeking a custody and support order for a child born during the relationship through means of artificial insemination. She alleged standing as the "intended parent" of the child. *Id.* at *1. The court observed, however, that at the time of the lawsuit, the Code only gave an "intended parent" the right to bring a suit to adjudicate parentage under the UPA.[14] *Id.* at *2, *citing* TEX.FAM.CODE ANN. § 160.602(8) ("[A] proceeding to adjudicate parentage may be maintained by . . . a person who is an intended parent."). And, significantly, although section 102.003 of the Code was later amended to give standing to certain categories of "intended parents" to bring an original SAPCR proceeding, at the time it did not. *Id.*

---

[14] The UPA defines the term "intended parents" to mean "individuals who enter into an agreement providing that the individuals will be the parents of a child born to a gestational mother by means of assisted reproduction, regardless of whether either individual has a genetic relationship with the child." TEX.FAM.CODE ANN. § 160.102(9).

Given the prior Code's failure to recognize an "intended parent" as an individual with standing to bring an original SAPCR petition, the court in *N.M.B.* therefore affirmed the trial court's decision to dismiss the SAPCR petition for lack of standing. *Id*.

The opinion in *N.M.B.* was therefore based solely on the fact that the Code at the time did not grant "intended parents" standing to bring an original SAPCR petition. In contrast, Cristina brought her original SAPCR petition based on her allegation that she had standing as the parent of a child born during her legal marriage to Andrea—a category expressly recognized by section 102.003(1) of the Code. We therefore find nothing in the opinion in *N.M.B.*, or elsewhere in the Texas Family Code, that would prohibit Cristina from asserting standing as the child's parent in her SAPCR proceeding, and to have her rights determined in that proceeding.

### 4. The impact of the parties' divorce decree

The concurring opinion raises a second issue that is not addressed by the parties in their briefing—whether Cristina should be estopped from asserting her standing as a parent due to the statement the parties made in their agreed-divorce decree that no child was born during the parties' marriage.

Andrea did not properly raise an estoppel issue in the trial court, nor did the trial court rely on an estoppel theory in reaching its decision to dismiss Cristina's SAPCR petition. If Andrea had wished to assert that Cristina was judicially estopped from claiming that a child was born during the marriage based on their divorce proceedings, she was required to raise the issue of estoppel as an affirmative defense in her pleadings, which she failed do.[15] *See Burket v. Delaware Drilling Corp.*, 435 S.W.2d 307, 308–09 (Tex.App.--El Paso 1968, writ dism'd), *citing* TEX. R.

---

[15] Judicial estoppel is a common law doctrine utilized to prevent a party from asserting a claim in a legal proceeding that is inconsistent with position taken by that party in a previous proceeding. *Garcia v. BNSF Ry. Co.*, 387 S.W.3d 763, 767 (Tex.App.--El Paso 2012, no pet.).

CIV. P. 94 (providing that a party shall set forth in a pleading all affirmative defenses); *see also Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 553 (Tex. 2002) (recognizing judicial estoppel as an affirmative defense). As such, it is not a defense that is properly before us. *See Neeley v. Sw. Inv. Co.*, 430 S.W.2d 465, 469 (Tex. 1968) (appellate court "could not properly render judgment on the basis of an affirmative defense which had not been urged in the trial court"); *In re Estate of Dillard*, 98 S.W.3d 386, 396 (Tex.App.--Amarillo 2003, pet. denied) (claim of judicial estoppel was waived where party failed to affirmatively plead it as a defense); *Gulf States Abrasive Mfg., Inc. v. Oertel*, 489 S.W.2d 184, 186 (Tex.Civ.App.--Houston [1st Dist.] 1972, writ ref'd n.r.e.) (same).

Nor does our record support the argument. At the hearing on the temporary orders, Cristina testified that due to their "confusion," she and Andrea submitted a pro se agreed divorce decree to the trial court for signature, in which they stated that there were no children born during the marriage. At another hearing, Andrea's attorney made statements indicating that Cristina had filed a bill of review in the divorce case, presumably to clarify that a child had in fact been born during the marriage, and further indicated her belief that the trial court had ruled upon the bill. However, that ruling does not appear in the record, and there is nothing in the appellate record to indicate how the trial court ruled on the bill of review, nor have the parties asked us to take judicial notice of the proceedings in which the bill was considered.

We also sense a finality problem with a divorce decree where the parties failed to inform the trial court of the existence of a child born during the marriage. The Family Code expressly provides that during a divorce proceeding, the parties must disclose the names and identities of any children born during the marriage so that the trial court may determine the parties' support obligations. *See* TEX.FAM.CODE ANN. § 6.406(a) ("The petition in a suit for dissolution of a

30

marriage shall state whether there are children born or adopted of the marriage who are under 18 years of age or who are otherwise entitled to support as provided by Chapter 154."). In effect, this requirement amounts to a mandatory joinder of a divorce proceeding with a SAPCR proceeding to determine support obligations that the parents might have to the children. When the parties do not include a required SAPCR in the divorce proceeding, any resulting divorce decree cannot be considered final.[16] *See, e.g.*, *Diaz v. Diaz*, 126 S.W.3d 705, 708 (Tex.App.--Corpus Christi–Edinburg 2004, no pet.); *In Interest of B.T.G.*, 494 S.W.3d 839, 843–44 (Tex.App.--Dallas 2016, no pet.) (where SAPCR was improperly separated from divorce, the divorce decree was "interlocutory," preventing appellate court from addressing any issues in the divorce proceedings, and instead warranting a remand of the proceedings to the trial court); *see also Brown v. Brown*, 917 S.W.2d 358, 361 (Tex.App.--El Paso 1996, no writ) (McClure, J. concurring) (collecting cases for the proposition that "[d]ivorce decrees which reserve issues of child support are not accorded the presumption of finality").

Stated otherwise, a divorce decree that mistakenly states that no children were born during the marriage, or which fails to include all the children who were born during the marriage, cannot be considered final. *See Clark v. Clark*, 196 S.W.2d 343, 345 (Tex.App.--Texarkana 1946, no writ) (where husband sought and obtained a default judgment in a divorce proceeding, which erroneously stated that no children had been born during the marriage, the decree could not be considered final where the wife later filed a motion for new trial and came forward with evidence that a child was in fact born during the marriage); *see also Hawkins v. Hawkins*, 999 S.W.2d 171,

---

[16] In fact, at least one court has held that the parties' failure to follow the Code's mandatory joinder requirements renders a divorce decree void. *See, e.g., Soliz v. Soliz*, No. 13-02-010-CV, 2003 WL 21025900, at *2 (Tex.App.--Corpus Christi–Edinburg May 8, 2003, no pet.) (mem. op.), *citing Daniels v. Daniels*, 45 S.W.3d 278, 282 (Tex.App.--Corpus Christi 2001, no pet.).

177 (Tex.App.--Austin 1999, no pet.) (where wife obtained a default judgment in divorce proceeding, but only disclosed the existence of three of the four children born during the marriage, husband was entitled to reopen the divorce decree to address paternity and support issues for the fourth child); *Gonzalez v. Gonzalez*, 177 S.W.2d 328, 329, 331 (Tex.App.--El Paso 1943, no writ) (husband's divorce petition was "insufficient" to support a divorce decree where the petition only provided the court with information regarding two of the three children that were born during the marriage). Here, the unrebutted evidence demonstrated that Andrea gave birth to a child during her marriage to Cristina (regardless of who the other parent might be), yet the parties failed to disclose the child's existence to the court during the divorce proceeding and failed to include a SAPCR to address custody and support issues as required by the Family Code. Accordingly, the parties' divorce decree cannot be considered final for the purpose of giving conclusive effect on any issues pertaining to the undisclosed child.

For similar reasons, we reject any assertion that the UPA requires us to treat the divorce decree as being a "final adjudication" that no child was born during the parties' marriage. Section 160.637 of the UPA provides that "a determination of parentage is binding on . . . all parties to an adjudication by a court acting under circumstances that satisfy the jurisdictional requirements of Section 159.201," (i.e., relating to out-of-state parties). *See* TEX.FAM.CODE ANN. § 160.637(a)(2). One might read this section to say that if a divorce decree makes a finding that there were no children of the marriage, it becomes a conclusive adjudication of parentage (or more particularly, non-parentage). That argument, however, overlooks section 160.637 of the UPA, which provides that "in a proceeding to dissolve a marriage, the court is considered to have made an adjudication of the parentage of a child if "the final order: (1) expressly identifies the child as 'a child of the marriage' or 'issue of the marriage' or uses similar words indicating that the husband

32

is the father of the child; or (2) provides for the payment of child support for the child by the husband unless paternity is specifically disclaimed in the order." TEX.FAM.CODE ANN. § 160.637(c). Here, however, although there is no doubt that a child was born during the marriage, the parties' divorce decree failed to identify the existence of the child and did not provide for the payment of child support. Consequently, the divorce court did not make a "final adjudication" with respect to any parentage issues.[17]

Here, the limited evidence in our record suggests that during their divorce proceedings, Andrea and Cristina took two improper actions. First, they failed to disclose the existence of a child that was admittedly born during their marriage and failed to initiate a SAPCR proceeding that would have allowed the court to determine custody and support issues during their divorce proceeding, as required by the Family Code. Second, they entered into a private agreement regarding custody and support issues pertaining to the child, without seeking court approval. As explained above, however, their improper unilateral actions in avoiding the entry of a formal SAPCR order cannot alter the existence of a support duty, nor should their actions prohibit a court from entering an appropriate conservatorship and support order to address the child's needs now that her existence has come to light. And given our conclusion that Cristina has standing to bring a SAPCR petition as a presumed parent under a gender-neutral interpretation of the Family Code to seek such an order, we cannot allow the errors that occurred in the earlier divorce proceeding to stand in her way.

---

[17] And were it otherwise, we would be sanctioning the parties' ability fail to disclose to the court the existence of children born to the marriage when obtaining a court sanctioned divorce. That in turn would frustrate the legislative policy of protecting the interests of children, which includes the policy of establishing and enforcing child support obligations. *See Treto*, 622 S.W.3d at 402, *citing Williams*, 821 S.W. 2d at 145 (recognizing that the Code expressly requires that all parental agreements concerning child support be approved by the court, which can accept or reject the agreement depending on whether or not it is in the child's best interest), *citing* TEX.FAM.CODE ANN. § 14.06(a)–(d) (repealed 1995) (recodified at TEX.FAM.CODE ANN. § 154.124) (requiring court approval of agreements pertaining to child support to ensure that any such agreements are in the child's best interest).

Cristina's Issue One is sustained.

## V. CONCLUSION

In conclusion, although we express no opinion on the merits of Cristina's claim to be appointed the conservator of the child born during the parties' same-sex marriage, we simply hold that she can exercise her constitutional right to assert that claim and to have her day in court. We therefore reverse the trial court's judgment dismissing Cristina's SAPCR petition, and remand this matter to the trial court for further proceedings in accordance with our opinion. Because we reverse on Cristina's first issue, we find it unnecessary to consider her second issue.

JEFF ALLEY, Justice

August 30, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.
Palafox, J., Concurring